708 F.2d 1511
 Fed. Sec. L. Rep. P 99,163
Herman ZOBRIST, Neil Rasmussen and Phil Rasmussen,
Plaintiffs-Appellees, Cross- Appellants,
v.
COAL-X, INC., a corporation, Emmet L. Shultz and Paul B.
Baker, Defendants- Appellants, Cross-Appellees,
and
Gulf Energy Corporation, a corporation, Russell L. Greene
and Does I Through XX, Defendants, Cross-Appellees.
 Nos. 82-1055, 82-1104.
 United States Court of Appeals,
Tenth Circuit.
 April 11, 1983.
Rehearing Denied July 1, 1983.
 
 Robert A. Peterson of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for plaintiffs-appellees, cross-appellants.
 Daniel L. Berman of Berman & Anderson, Salt Lake City, Utah (Gary F. Bendinger and Richard W. Casey of Giauque & Williams, Salt Lake City, Utah, with him on briefs), for defendants-appellants, cross-appellees.
 Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.
 BARRETT, Circuit Judge.
 
 
 1
 Phil Rasmussen, appellee in No. 82-1055, and Neil Rasmussen and Herman Zobrist, cross-appellants in No. 82-1104, brought an action pursuant to section 10(b) of the Securities and Exchange Act of 1934 and rule 10b-5 promulgated under that section, against Coal-X, Inc., Emmet L. Shultz, and Paul B. Baker (defendants). The jury rendered a special verdict in the amount of $50,000 in favor of Phil Rasmussen against the three defendants. Although there was a slight ambiguity in the verdict, the trial judge entered a judgment in that amount against the defendants. In the special verdict, however, the jury determined that Neil Rasmussen and Herman Zobrist were not entitled to damages and judgment was entered accordingly. In No. 82-1055, the defendants appeal from the judgment in favor of Phil Rasmussen, while in No. 82-1104, Neil Rasmussen and Herman Zobrist appeal from the judgment in favor of the defendants.
 
 I.
 
 2
 Both appeals arise from the same business transaction, the organization of Coal-X, Ltd./'76 (Coal-X '76), a Utah limited partnership formed to raise venture capital for a coal mining operation in West Virginia. Coal-X, Inc. is the general partner in Coal-X '76. At the time relevant here, the summer of 1976, Emmet Shultz was the president and a director of Coal-X, Inc., while Paul Baker was a vice-president and a director of that entity. While employed by the Huntsman Coal Company, Shultz, with the assistance of independent geologists, evaluated a certain coal property in West Virginia. Based on those evaluations, the Huntsman Coal Company entered into a sublease which granted it the right to develop the coal on that property. The company prepared a private placement memorandum and certain projections in anticipation of selling limited partnership interests to finance the development of the property. Later, for disputed reasons, Huntsman Coal Company abandoned the project and sold its entire interest in the project, including the private offering materials, to Shultz for $5,000. Shultz subsequently left Huntsman Coal Company and prepared to develop the coal property through Coal-X '76.
 
 
 3
 Pursuant to section 4(2)[1] of the Securities Act of 1933, and rule 146[2] promulgated thereunder, interests in Coal-X '76 were marketed through a private placement offering. Accordingly, interests in Coal-X '76 could be offered only to a limited number of investors, all of whom either possessed "such knowledge and experience in financial and business matters that [they were] capable of evaluating the merits and risks of the prospective investment" or were persons "who [were] able to bear the economic risk of the investment". Rule 146(d)(1), 17 C.F.R. Sec. 230.146 (1981) (removed at 47 Fed.Reg. 11261 (1982)). Herman Zobrist, Neil Rasmussen, and Phil Rasmussen were among the investors contacted by the defendants to purchase interests in Coal-X '76.
 
 
 4
 Shultz and Baker, and their representatives, met with Zobrist and the Rasmussens several times over a period of about thirty to forty-five days before any interests were sold. At those meetings, the defendants described the investment as a good opportunity and provided oral and written projections which presented the potential benefits of the investment. Although there was conflict in the evidence, the jury apparently determined that Baker represented to Phil Rasmussen that the investment "couldn't miss" and was a "sure thing". When Phil Rasmussen challenged those assertions, the defendants assured him that there were "no risks" in the investment and that they would guarantee with their stock that the investment would work out as projected.
 
 
 5
 Either prior to the time the Rasmussens and Zobrist purchased their interests in Coal-X '76, or shortly thereafter, the defendants provided each of those investors with a Private Placement Memorandum.[3] The memorandum clearly and specifically stated the risks involved in the investment, including the lack of a firm output contract, the speculative nature of coal mining, the fluctuation of metallurgical coal prices in response to fluctuations in steel production, and competition from larger, more experienced coal mining companies. Prior to the time of their purchases, Zobrist and the Rasmussens each signed an "Application Form and Subscription Agreement" which included a statement that the investor recognized that the investment was subject to the risks set forth in the Private Placement Memorandum. Phil Rasmussen also completed and signed an "Investment Questionnaire" wherein he responded affirmatively to questions inquiring whether he had read the memorandum and whether he understood the nature of the investment and the risks involved. It is undisputed, nevertheless, that Zobrist and the Rasmussens in fact did not read the Private Placement Memorandum prior to investing in Coal-X '76.
 
 
 6
 Herman Zobrist and Phil Rasmussen each purchased two units in Coal-X '76 at $35,000 per unit and Neil Rasmussen purchased one unit. Pursuant to Utah law, each investor was afforded an opportunity to rescind his purchase but declined to do so. Due to permitting problems and unusually severe weather, Coal-X '76 did not commence commercial production until 1977. After production began, labor strikes impeded the development of the venture and declining steel production depressed the price offered for metallurgical coal. Consequently, Coal-X '76 lost between $800,000 and $900,000 between 1977 and 1979, which in turn reduced the value of a limited partnership interest in Coal-X '76. Gulf Energy, a parent of Coal-X, Inc., loaned over $800,000 to Coal-X '76 to keep the mine in operation. The mine remains in operation today and has produced at levels exceeding what was originally projected.
 
 
 7
 In 1979, however, the Rasmussens and Zobrist became convinced that the investment had missed, and filed this action, claiming damages as a result of violations of section 10(b) of the Securities and Exchange Act of 1934[4] and rule 10b-5 promulgated thereunder.[5] Phil Rasmussen claimed that the defendants' assertions and guarantees that the investment involved no risk were misrepresentations of material facts in violation of rule 10b-5. In addition, the Rasmussens and Zobrist asserted that the defendants violated rule 10b-5 by failing to disclose material facts. The jury, in a special verdict, found that each of the defendants knowingly violated rule 10b-5 by misrepresenting material facts to Phil Rasmussen, that he justifiably relied on those misrepresentations, and that as a result, he suffered $50,000 in damages. With respect to Neil Rasmussen and Herman Zobrist, however, the jury found that while the defendants violated rule 10b-5 by knowingly failing to disclose material facts to those investors, the investors had not justifiably relied on those failures to disclose. Thus, the jury found that Neil Rasmussen and Zobrist were not entitled to any damages.
 
 
 8
 On appeal, the primary contention of the defendants is that, as a matter of law, Phil Rasmussen's reliance on the misrepresentations that the investments involved no risk could not be "justifiable" when those representations were contradicted by the warnings in the Private Placement Memorandum, which he failed to read. The defendants also contend that there was not evidence to support the damage award of $50,000, that the damage award was based on an ambiguous special jury verdict, and that the trial court's instruction on scienter was erroneous.[6] The cross-appellants, Neil Rasmussen and Zobrist, contend that because the defendants failed to disclose material facts, reliance should have been presumed. In addition, Zobrist and both the Rasmussens argue that the trial court erred in not granting them a rescissional measure of damages.
 
 II.
 A.
 
 9
 We will first examine the contention of the defendants that Phil Rasmussen did not "justifiably rely" on the misrepresentations as to the risk involved in the investments. In a misrepresentation case under rule 10b-5, a plaintiff generally must establish that in connection with the purchase or sale of a security, the defendant, with scienter, made a false representation of a material fact upon which the plaintiff justifiably relied to his or her detriment. See Holdsworth v. Strong, 545 F.2d 687, 694 (10th Cir.1976), (en banc), cert. denied, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805 (1977). In the instant case, the jury found that the defendants did make the "no risk" representations, that Phil Rasmussen relied on those misrepresentations, and that such reliance was justifiable. The defendants argue that since Phil Rasmussen was a sophisticated businessman with prior investment experience, his reliance on the no risk representations without reading the Private Placement Memorandum, which expressly warned of risks, was not justifiable as a matter of law. Phil Rasmussen responds that the jury examined the defendants' entire course of conduct in finding that his reliance was justifiable. If the effect of such conduct can be mitigated by "boiler plate" recitations of risk in a prospectus, he contends, the prospectus will become a shield behind which promoters can safely hide while boldly making fraudulent misstatements to investors.
 
 B.
 
 10
 In essence, both parties request that this court examine the prospectus and the conduct of the parties independent of one another and seek to focus our attention on the elements which support their respective contentions. To determine whether reliance was justifiable, however, we must examine all of the elements of the transaction. Justifiable reliance is not a theory of contributory negligence; rather, it is a limitation on a rule 10b-5 action which insures that there is a causal connection between the misrepresentation and the plaintiff's harm. Holdsworth v. Strong, supra at 694-95. Only when the plaintiff's conduct rises to a level of culpable conduct comparable to that of the defendant's will reliance be unjustifiable. Id. at 693. In this circuit, such conduct must amount to at least reckless behavior. See Hackbart v. Holmes, 675 F.2d 1114, 1117 (10th Cir.1982).
 
 
 11
 Courts have examined a number of factors in determining whether reliance on misrepresentations is justifiable in a particular fact situation. In Holdsworth v. Strong, for example, the plaintiff was an attorney and accountant who had access to the relevant corporate books and records. On the basis of misrepresentations by a close business and personal friend, the plaintiff sold his stock in the corporation without first examining the corporate books and records. Three judges of an equally divided court concluded that under those circumstances, the plaintiff's reliance was justifiable, despite his sophistication and failure to investigate, because the defendant had carefully cultivated the plaintiff's trust and confidence over a long period of time, and then used that trust to encourage the sale. Id. at 696-97. It must be noted, however, that the judges also concluded that an examination of the corporate books and records would not have revealed the falsity of the defendant's representations. Id. at 697.
 
 
 12
 Similarly, a review of the cases from other circuits indicates that the following are all relevant factors in determining whether reliance was justifiable: (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations. See G.A. Thompson & Co., Inc. v. Partridge, 636 F.2d 945, 955 (5th Cir.1981); Nye v. Blyth Eastman Dillon & Co., Inc., 588 F.2d 1189, 1197 (8th Cir.1978); Straub v. Vaisman & Co., 540 F.2d 591, 598 (3d Cir.1976); Hughes v. Dempsey-Tegeler & Co., Inc., 534 F.2d 156, 176-77 (9th Cir.), cert. denied, 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (1976). No single factor is determinative; all relevant factors must be considered and balanced to determine whether reliance was justified. See, e.g., Holdsworth v. Strong, supra at 696-97; Nye v. Blyth Eastman Dillon & Co., Inc., supra at 1197; Straub v. Vaisman & Co., supra at 598.
 
 
 13
 This court has not articulated a standard by which it can be determined whether in light of the circumstances the reliance was justifiable. At a minimum, though, "a plaintiff may not reasonably or justifiably rely on a misrepresentation where its falsity is palpable." Holdsworth v. Strong, 545 F.2d at 694. The trial court here instructed the jury that the test to be applied was whether the plaintiff's
 
 
 14
 reliance was justified; that he did not intentionally close his eyes and refuse to investigate, concerning the circumstances, in disregard of a risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.
 
 
 15
 [Joint App., Vol. I, p. 288]. This standard is followed by the Fifth Circuit Court of Appeals, Gower v. Cohn, 643 F.2d 1146, 1156 (5th Cir.1981); Dupuy v. Dupuy, 551 F.2d 1005, 1020 (5th Cir.1976), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977), and we consider it appropriate to apply in the instant case.
 
 C.
 
 16
 In considering the factors and applying the test to determine whether Phil Rasmussen's reliance was justified, however, we are confronted with an unusual factual situation. While in other cases the plaintiff failed to investigate information to which he had access, Holdsworth v. Strong, supra at 692, or to read information which the defendants provided, Nye v. Blyth Eastman Dillon & Co., supra at 1197, we have found no relevant cases wherein the plaintiff failed to read a prospectus or equivalent document which disclosed information in accordance with the requirements of the Securities Act of 1933.[7] It is our view that while the full and fair disclosure of information in the Private Placement Memorandum is a relevant factor which favors the defendants here, such disclosure is not determinative, even though Phil Rasmussen was a sophisticated and knowledgeable investor.
 
 
 17
 We observe, however, that had Phil Rasmussen read the Private Placement Memorandum, he undeniably would have been notified of the risks of the investment. Indeed, prominently displayed on the first page of the Private Placement Memorandum was the following warning:
 
 
 18
 THESE SECURITIES INVOLVE A HIGH DEGREE OF RISK. See "Risk and Special Factors" and "Who Should Invest."
 
 
 19
 The section entitled "Who Should Invest" began on page 8 of the memorandum and included several monitions, beginning with the following:
 
 
 20
 Investment in the Units offered hereby may be considered to involve a high degree of risk, and is suitable only for investors of substantial net worth who are willing to purchase an investment which cannot be easily liquidated and may not provide immediate cash returns. There is no public or other market likely to develop for the Units and their transferability is restricted.
 
 
 21
 In the four pages under the heading of "Risks and Special Factors", the risks associated with coal mining and the limited partnership form were succinctly presented. In addition, early in the memorandum the following warning appeared: "No person has been authorized to give any information or to make any representations not contained in this Memorandum ... and, if given or made, such information or representations must not be relied upon."
 
 
 22
 Of course, we do not imply that the defendants can disclaim responsibility for their misrepresentations simply by disclosing the risks in the memorandum and therein warning investors not to rely on representations not contained within the memorandum. Had Phil Rasmussen read the memorandum, though, there would be a substantial question whether his reliance on the original misrepresentations of no risk, absent further inquiry, would be justifiable. Since the memorandum expressly contradicted the representations, he would have to show compelling reasons for passively accepting the contradictions. In the sense of proving justifiable reliance, Phil Rasmussen is consequently in a better position than he would have been had he read the memorandum and yet relied on the original misrepresentations. While we are not certain that this result would encourage investors to throw caution and prospectuses to the wind, we see no reason to reward investors who do so. See Straub v. Vaisman & Co., Inc., 540 F.2d at 597-98. Thus, it is our view that knowledge of information contained in a prospectus or an equivalent document authorized by statute or regulation, should be imputed to investors who fail to read such documents. We thus hold that Phil Rasmussen must be charged with constructive knowledge of the risks and warnings contained in the Private Placement Memorandum.
 
 
 23
 Charging Phil Rasmussen with constructive knowledge does no more than place him in a position equal to that of a cautious investor. We are imputing knowledge of information only to the extent to which such information actually was disclosed. That is, we do not charge him with information that a knowledgeable investor would infer from the printed words or numbers; we impute knowledge of the printed words or numbers only. Nor does such constructive knowledge alter the standard of justifiable reliance. The only consequence of imputing knowledge of the contents of the Private Placement Memorandum to Phil Rasmussen is that when the various factors are considered in evaluating justifiable reliance, his conduct must be examined as if he were aware of the warnings contained in the memorandum.
 
 D.
 
 24
 Under the circumstances of this case, when we impute to Phil Rasmussen knowledge of the warnings contained in the Private Placement Memorandum, it becomes clear that, as a matter of law, his reliance on the misrepresentations was not justified. We reach this conclusion after a consideration of the above noted factors. It is true that Phil Rasmussen previously participated in investments with Baker, but there was no evidence of any long standing business or personal relationship that, in light of the patent contradiction between Baker's representations and the express warnings disclosed in the Private Placement Memorandum, would justify Rasmussen's reliance on Baker's representations without further inquiry. Not only did the defendants not conceal their fraud from Rasmussen, they provided him with information and warnings which exposed the representations as false. It was not necessary for Rasmussen to delve into voluminous books and records, or to decipher balance sheets and financial statements; the warning on the first page of the memorandum contradicted the representations of no risk, and there were four full pages devoted to concise, informative descriptions of the risks inherent in coal mining and partnerships.
 
 
 25
 In short, there is simply no evidence which provides a valid reason for Rasmussen's reliance on the general misrepresentations as to risk when he is considered to have knowledge of the specific warnings contained in the memorandum. We do not say that such reliance might not be justified under different factual circumstances. We simply conclude that, in this case, when knowledge of the disclosed risks is imputed to Phil Rasmussen, it is evident that he acted recklessly by intentionally closing his eyes to and failing to investigate the contradiction between the misrepresentations and the information in the memorandum. As a matter of law, Phil Rasmussen could not rely on the misrepresentations without further inquiry. The fact that he may be able to prove a breach of contract under state law on the guarantee does not alter our conclusion that Rasmussen's reckless conduct bars recovery under rule 10b-5. Broad v. Rockwell International Corp., 614 F.2d 418, 438-39 (5th Cir.1980), modified on other grounds, 642 F.2d 929 (en banc), cert. denied, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). See also Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 478, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977).
 
 II.
 
 26
 The cross-appellants, Neil Rasmussen and Herman Zobrist, contend that the defendants wilfully and knowingly failed to disclose material information.[8] Zobrist and Neil Rasmussen contend that the information was material as a matter of law. Consequently, they argue, under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), reliance should be presumed. We do not dispute the cross-appellant's contentions; indeed, the trial court correctly instructed the jury on these matters and the jury expressly found that the information was material. Pursuant to another instruction, however, the jury also found that Neil Rasmussen and Zobrist did not prove "reliance". The cross-appellants challenge the jury's conclusion by vaguely arguing that the trial court's "reliance" instruction can be read to suggest that the cross-appellants had to prove actual reliance. The cross-appellants do not specify any defect in the instruction, nor can we discern any.
 
 
 27
 After describing reliance and justifiable reliance in terms of a case of misrepresentation, the trial court instructed the jury on the element of reliance in a case of omission or failure to disclose:
 
 
 28
 The plaintiff's burden of proof is different with regard to the element of reliance when there is an intentional omission of a material fact, which makes a statement made misleading. With regard to such a claimed material omission, the burden of proof on the issue of reliance is different. If there had been an intentional omission of material fact, it would be difficult for the plaintiffs to prove that they relied on something they did not know and the law infers that the plaintiffs would have relied upon facts which are shown to be material and are intentionally withheld. Accordingly, if you find from a preponderance of the evidence that there were material facts intentionally not disclosed to the plaintiffs in connection with the transactions in question, then the defendants and not the plaintiffs have the burden to demonstrate that even if the material facts had been disclosed, the plaintiffs' investment decision would not have been different.
 
 
 29
 [Jt.App.Vol. I at p. 288] (Emphasis added). We hold that this instruction properly informed the jury of the allocation of the burden of proof on the reliance issue in a case of failure to disclose.
 
 
 30
 In accordance with Affiliated Ute, the instruction informed the jury that reliance could be inferred from a showing of materiality. The inference of reliance, however, is not conclusive. Most courts, as did the trial court here, simply shift the burden of proof of non-reliance to the defendant. See Shores v. Sklar, 647 F.2d at 468.[9] The trial court correctly instructed the jury that the defendant meets this burden when he establishes that the plaintiff's investment decision would not have been different even had the defendant disclosed the omitted material facts. Id. It is clear that the jury dutifully followed the trial court's instruction and found that although the omitted facts were material, the defendants proved that even if the information were disclosed the cross-appellants would not have acted differently. Inasmuch as the cross-appellants did not read the Private Placement Memorandum, there was substantial evidence to support the jury's verdict.
 
 III.
 
 31
 In light of our disposition in this case, we need not consider the remaining contentions of error.
 
 
 32
 The judgment in No. 82-1055 is reversed and the judgment in 82-1104 is affirmed.
 
 
 33
 HOLLOWAY, Circuit Judge, concurring and dissenting:
 
 
 34
 I concur in the affirmance of the judgment based on the jury's verdict in No. 82-1104. However, I must respectfully dissent from the opinion as to No. 82-1055. The majority opinion, while purporting not to overrule our opinion in Holdsworth v. Strong, 545 F.2d 687 (10th Cir.1976) (en banc), cert. denied, 430 U.S. 955, 97 S.Ct. 1600, 51 L.Ed.2d 805, in fact cannot be reconciled with that precedent. Moreover, the majority's resolution of this issue defeats the main purpose of the securities law to protect from fraud and misrepresentation, unsoundly striking the balance in favor of the wrongdoers by penalizing a plaintiff for his neglect or recklessness in not discovering the defendants' intentional wrongs. All this is done without questioning the jury's well supported findings on the defendants' knowing misrepresentations or omissions.
 
 
 35
 The majority opinion (pp. 1516-1517) agrees with the trial judge's statement in his charge to the jury of the test for justifiable reliance, and I likewise accept that test. The majority also correctly notes that Holdsworth held that the plaintiff's conduct in Rule 10b-5 cases will bar recovery only when it "rises to a level of culpable conduct comparable to that of the defendant ...." (Emphasis added). Ante at 1516. To me, however, the majority opinion's application of this rule is illogical. It observes that a defendant's liability must be based on misbehavior rising (or sinking) at least to the level of recklessness. The opinion labels plaintiff Phil Rasmussen's behavior "reckless" and hence denies recovery. What is wanting is recognition of the fact that in light of the jury's unquestioned findings here, the defendants' conduct cannot be sanitized so as to say it was merely comparable to the plaintiff's conduct.
 
 
 36
 The jury specifically found otherwise and there is ample evidence in the record supporting the jury's finding that the defendants were guilty of material misrepresentations or omissions. The jury found that each of the defendants made untrue statements or omissions of material facts or otherwise attempted to defraud the plaintiffs, and that these acts were done "knowingly."[1] Furthermore, the jury found that plaintiff Phil Rasmussen "justifiably and reasonably relied" thereon.[2] The majority opinion (pp. 1517-1518) rejects the jury finding of justifiable reliance not by a process of showing a lack of credible testimony by plaintiff on knowing misrepresentations and omissions by the defendants; indeed the majority plainly base their reversal on the proposition that "the defendants did not conceal their fraud from Rasmussen, they provided him with information and warnings which exposed the representations as false." (Ante at 1518; emphasis added). The jury's findings are overturned only by imputing to the plaintiff constructive knowledge of the Private Placement Memorandum. Thus the knowing misrepresentations or omissions are accepted as proven. The case then comes down to whether the important policies of the securities law and the regulation are served by imposing a loss on the plaintiff by imputing knowledge to him of the printed exculpatory statements and by exonerating the defendants who were found guilty of "knowing" wrongful conduct. (See concluding paragraph of note 1, supra ).
 
 
 37
 Holdsworth presented the occasion for this court to reevaluate the requirement of due diligence by the plaintiff in Rule 10b-5 actions in light of the Supreme Court's holding in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that proof of defendant's scienter, an intent to defraud or deceive, is a necessary predicate to establish liability. In rejecting the argument for liability based on mere negligence, the Court there said the language of Sec. 10(b) "clearly connotes intentional misconduct," id. at 210, 96 S.Ct. at 1389--the standard carefully followed by the trial judge in his charge here. (See note 1, supra ). The Holdsworth opinion concluded that if the plaintiff were required to prove both the defendant's scienter and his own due diligence, the remedy would be undesirably restricted. Holdsworth decided that "[i]f contributory fault of plaintiff is to cancel out wanton or intentional fraud, it ought to be gross conduct somewhat comparable to that of defendant." 545 F.2d at 693. The opinion went on to note that at common law a plaintiff's contributory negligence was not a defense to intentional fraud. Holdsworth is thus in harmony with the antecedents to our present federal securities law.
 
 
 38
 I am convinced that the resolution in Holdsworth of the competing policy considerations was correct in light of Ernst v. Ernst and the common law underpinning of the securities law protections. One of the principal policies behind the Acts is to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing. Ernst v. Ernst, supra, 425 U.S. at 195, 96 S.Ct. at 1382; Dupuy v. Dupuy, 551 F.2d 1005, 1019 (5th Cir.), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197. The majority here is understandably concerned about aiding a plaintiff who has failed to read material furnished him concerning the investment. There are two responses to that concern. First, the policy of prevention of fraud is the core of the securities laws and must not be overlooked simply because other conflicting policies are also implicated. Indeed, not only in the area of securities but generally the policy of deterring intentional misconduct outweighs that of deterring negligent or reckless conduct. Precisely for this reason Holdsworth has been influential when other courts have reexamined these issues. See, e.g., Dupuy v. Dupuy, supra, 551 F.2d at 1018.[3] "[T]he federal policy of deterring intentional misconduct in securities dealings outweighs the policy of deterring negligent behavior by investors." Dupuy v. Dupuy, supra, 551 F.2d at 1019. Secondly, the jury here found for the plaintiff under a charge that clearly required the plaintiff to prove that he justifiably relied on the misrepresentations, "that he did not intentionally close his eyes and refuse to investigate, concerning the circumstances in disregard of a risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." (I J.A. 288).
 
 
 39
 To satisfy the requirement of showing that defendants were guilty of intentional misconduct here, there was evidence before the jury of an extended period of discussions for 30 days or more by the defendants, repeatedly extolling the investments. For example, in comparing the Coal-X issue to other investment opportunities that Phil Rasmussen had been offered by Baker and his company, Baker said that the Coal-X venture was "one of their best, probably the best." (II J.A. 374, 377). Rasmussen also testified that he raised all his doubts and questions in discussions with defendants on two occasions and that defendants repeatedly assured him that the deal was as good as it was presented to be, if not better. (II J.A. 375-77). Rasmussen testified that the project was described as "a sure thing," a deal on which "you can't miss," and that the presentations made the offer appear "so good that there was just no way that I should let it go by me." (II J.A. 374, 376). When the plaintiff said he would have to borrow the money, the defendants said they would "guarantee" the investment. (II J.A. 376-78). In fact, one of defendants' salesmen, Mr. Bleazard, testified that defendant Baker had said to Phil and Neil Rasmussen that they "should get in on this. It is a good deal. I have enough stock so that you don't have to worry about losing your money." (II J.A. 418).
 
 
 40
 Using the projected profit figures supplied by the defendants, Phil Rasmussen figured that within eighteen months the cash flow would be sufficient for him to repay the money he borrowed to purchase the securities. (II J.A. 378). He further testified that, "I was promised and guaranteed by Mr. Baker that would be a reality and I could do that." (Id.). And there was evidence that defendant Baker made only the slightest effort to encourage plaintiff Phil Rasmussen to read the prospectus. Plaintiff testified as follows (II J.A. 381):
 
 
 41
 I asked him, I said, "Am I supposed to read this?" And he said, "well, yes, you should." I said, "That is an all-night reading and I don't think I have the time or expertise." I said, "Tell me what I really ought to know about it." He said, "Well, I have really told you in the projections," and so forth.Q. What about risks? Did he point out that document discusses risks involved in this venture?
 
 
 42
 A. No, he didn't point that out. (Emphasis added).
 
 
 43
 The projections referred to were two or three pages that painted a "rosy picture" of the tax advantages and return that the defendants told Phil Rasmussen he could expect to receive from his investment. (II J.A. 373-74). Thus there was ample evidence before the jury to support its critical findings against the defendants.
 
 
 44
 The cases relied on by the majority do not actually concern a plaintiff's recklessness. These cases, Broad and Santa Fe Industries, do hold that not all misdeeds are actionable under Rule 10b-5. They are cited to support the proposition that although the defendants may have breached a promise to guarantee plaintiff's investment, such would be the basis for a state law claim only, not a 10b-5 claim. I cannot agree that these cases support setting aside the verdict and judgment here. First, the "guarantee" allegedly made here is, unlike the conduct at issue in Broad and in Santa Fe Industries, squarely within the range of fraudulent conduct addressed by Rule 10b-5. And second, the "guarantee" expressed is relevant to the issue of the reasonableness of the plaintiff's reliance here and was a proper part of the proof supporting the 10b-5 claim.
 
 
 45
 In sum, the majority denies recovery to the plaintiff who was found to have justifiably relied on the defendants' knowingly made misrepresentations or omissions. The evidence supporting these findings is not challenged. The defendants are instead exonerated by a theory of constructive knowledge imputed to the plaintiff of the defendants' exculpatory boilerplate. Fashioning such a rule favoring those found guilty of knowing misconduct frustrates the important policy of the securities law and the Rule.
 
 
 46
 I concur in No. 82-1104. For the reasons stated I must respectfully dissent in No. 82-1055.[4]
 
 
 
 [1]
 Section 4(2) provides that "transactions by an issuer not involving any public offering" are exempt from the registration requirements of the Securities Act of 1933. 15 U.S.C. 77d(2) (1976)
 
 
 [2]
 Rule 146 was found at 17 C.F.R. Sec. 230.146 (1981) (removed at 47 Fed.Reg. 11261 (1982)), and provided guidelines which, if followed, would allow an issuer to claim exempt status under Sec. 4(2) of the Securities Act of 1933. The rule has now been superseded
 
 
 [3]
 Rule 146 provided that each offeree "shall have access" or "shall have been furnished" the same kind of information that would be included in a registration statement and prospectus required in a non-exempt offering. Rule 146(e)(1), 17 C.F.R. Sec. 230.146(e)(1) (1981), removed at 47 Fed.Reg. 1261 (1982). The Private Placement Memorandum was thus equivalent to a prospectus except that it had not been reviewed by the Securities and Exchange Commission
 
 
 [4]
 That section provides:
 Sec. 78j. Manipulative and deceptive devices
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. Sec. 78j(b) (1976).
 
 
 [5]
 The rule provides:
 Sec. 240.10b-5 Employment of manipulative and deceptive devices.
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. Sec. 240.10b-5 (1982)
 
 
 [6]
 Defendants also challenged the trial court's instruction on the burden of proof. They concede, however, that the recent Supreme Court decision in Herman & MacClean v. Huddleston, --- U.S. ----, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), establishes that the proper standard is one of a preponderance of the evidence, as the trial court correctly instructed
 
 
 [7]
 In Shores v. Sklar, 647 F.2d 462, 468-70 (5th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983), the plaintiff was held to have stated a cause of action for damages under rule 10b-5(a) or (c), despite his failure to read an offering circular. The plaintiff's claim, however, was based on alleged misrepresentations and non-disclosures contained in the circular. The issue was whether, despite his failure to read, the plaintiff could recover for those misrepresentations and omissions, not whether he could recover for other misrepresentations, despite full and accurate disclosure in the circular
 
 
 [8]
 The information that the defendants failed to disclose was that the Huntsman Coal Company abandoned the project that Coal-X '76 later operated after spending $250,000 preparing to develop the property, and sold their rights and materials to Shultz for $5,000. In addition, the defendants failed to disclose that if they sold a sufficient number of limited partnership unit interests, Coal-X '76 would be merged with Gulf Energy Corporation to the substantial personal benefit of the defendants
 
 
 [9]
 Accord: Rifkin v. Crow, 574 F.2d 256, 262 (5th Cir.1978); Crocker-Citizens National Bank v. Control Metals Corp., 566 F.2d 631, 636 n. 3 (9th Cir.1977); Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1048 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977); Chelsea Associates v. Rapanos, 527 F.2d 1266, 1271-72 (6th Cir.1975); Thomas v. Duralite Co., Inc., 524 F.2d 577, 585 (3d Cir.1975); Carras v. Burns, 516 F.2d 251, 257 (4th Cir.1975)
 
 
 [1]
 In the Special Verdict the jury first replied to the following question in the affirmative as to each plaintiff and each defendant:
 
 
 [1]
 In connection with any plaintiff's purchase of limited partnership interests in Coal-X, Ltd./'76, did any of the defendants (1) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading or (2) employ any device, scheme or artifice to defraud any plaintiff or engage in any act, practice, or course of business which operated as a fraud or deceit upon any plaintiff
 Answer for each plaintiff as against each defendant "Yes" or "No."
 The second question put to the jury in the Special Verdict, also answered affirmatively as to each defendant, was:
 Do you find that such acts, practices or misrepresentations or omissions of material fact, if any you have found in answer to question No. 1, were made by any defendant "knowingly" in connection with the purchase of limited partnership interests in Coal-X, Ltd./'76 by any plaintiff? Yes No
 I J.A. 290-91.
 The instructions had given the following guidance as to the meaning of the term "knowingly":
 The third element that each plaintiff must establish under Rule 10b-5 is that each defendant acted "knowingly" and that word is defined as follows as used in these instructions. It is not enough to show that the defendants acted accidentally, negligently or that they made a mistake. Rather, "knowingly" requires that the defendants acted with a mental state embracing intent to deceive, manipulate or defraud; that they stated material facts which they knew to be false; or stated untrue facts with reckless disregard for their truth or falsity; or knew of the existence of material facts which were not disclosed although they knew that knowledge of those facts would be necessary to make their other statements not misleading.
 I J.A. 287. (Emphasis added).
 
 
 [2]
 The instructions guided the jury in its determination that the reliance was reasonable and justifiable. Instruction No. 15 stated, in pertinent part (I J.A. 287-88):
 The fourth element of the plaintiffs' claim under Rule 10b-5 is the requirement of proof that each plaintiff "relied" upon the alleged misrepresentations or omissions and that he was "justified" in doing so.
 In the case of misrepresentations it must be proved that each plaintiff in fact relied upon the false statements. In other words, if you find that the plaintiffs would have engaged in the transaction anyway, and that the misrepresentation had no effect upon their decision, then there was no reliance and there can be no recovery....
 Further, each plaintiff must prove that his reliance was justified; that he did not intentionally close his eyes and refuse to investigate, concerning the circumstances in disregard of a risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. (Emphasis added).
 
 
 [3]
 See also Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1048 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); other cases are collected in Dupuy and in G. Baranko, Due Care: Still A Limitation On 10b-5 Recovery? 61 Marquette L.Rev. 122 (1977)
 
 
 [4]
 The majority opinion in No. 82-1055 does not reach several other issues argued as grounds for reversal. Therefore my dissent likewise treats only the issues covered by the majority opinion