Edward ARIOLI, Sandra L. Arioli, Dean E. Huber, Mary Ann Huber, John J. Laga, Jr., Denise Laga, Robert E. Wolfe, Lawrence A. Brainard, Rebecca S. Brainard, the Edward Arioli Revocable Trust, the Sandra L. Arioli Revocable Trust, the Dean E. Huber Revocable Trust, the Mary Ann Huber Revocable Trust, the John J. Laga, Jr. Revocable Trust and the Denise Laga Revocable Trust, Plaintiffs,

v.

PRUDENTIAL–BACHE SECURITIES, INC., Ronald J. Chewning, Terrence W. Sullivan, Equitec Venture Leasing Investors, 1984 Polaris Aircraft Trust VIII, 1984 Polaris Aircraft Trust IX, 1985 Polaris Aircraft Investors XII–A & XII–B, 1984 Polaris Aircraft Investors V Program, Daniel Properties VII, Franklin Stonemill Associates, Bordeaux Partners, Ltd. and Almahurst Bloodstock II, Defendants.

No. 87–70312.

United States District Court, E.D. Michigan, S.D.

May 14, 1992.

---

Stephen M. Ryan, MacDonald & Goren, Birmingham, Mich., for plaintiff, Arioli.

Lyle D. Russell, Jr., Frank & Stefani, Troy, Mich., for plaintiff, Brainard.

Michael G. Vartanian, Dickinson Wright, Detroit, Mich., for defendant Chewning.

## OPINION AND ORDER

GADOLA, District Judge.

Plaintiffs Edward Arioli, Sandra L. Arioli [the "Ariolis"], Dean E. Huber, Mary Ann Huber [the "Hubers"],[1] John J. Laga and Denise Laga [the "Lagas"],[2] individually and as trustees for their respective revocable trusts which are also plaintiffs, Robert E. Wolfe,[3] Lawrence A. Brainard and Rebecca S. Brainard [the "Brainards"] filed their initial complaint January 30, 1987. Subsequently, through various amended complaints by different parties, plaintiffs filed a joint, second amended complaint November 18, 1988, against defendants Prudential–Bache Securities, Inc. ["Prudential"], Ronald J. Chewning and Terrence W. Sullivan.[4]

Defendants filed separate motions for partial summary judgment against the Brainards and the Ariolis December 29, 1988. The Brainards filed a motion for partial summary judgment that same day. Defendants have acknowledged that the claims in their motions are identical for all the plaintiffs and therefore treat the motions as one. Pursuant to a January 31, 1990 stipulation and order, the Brainards and the Ariolis have filed a joint response to the two motions dated May 1, 1990. Defendants filed a reply to the joint response May 23, 1990.

By this court's August 17, 1990 order, the defendants' motion and the Brainards' motion were referred to Magistrate Judge Paul J. Komives for a report and recommendation. On October 22, 1990, the mag-

---

1. The Hubers were dismissed from the case with prejudice as individual party plaintiffs August 14, 1991. The Hubers' revocable trusts were dismissed from the case April 28, 1992.

2. The Lagas and their revocable trusts were dismissed from the case with prejudice April 12, 1989.

3. Wolfe was dismissed from the case with prejudice April 12, 1989.

4. The other named defendants have never been served and are therefore not active parties to the proceedings.

istrate judge issued his report and recommended denying in part defendants' motions for partial summary judgment and denying in part the Brainards' motion for partial summary judgment. Defendants filed objections to the report and recommendation November 5, 1990. The Ariolis responded January 22, 1991. Defendants filed supplemental briefs November 30, 1990, and July 2, 1991. The Ariolis filed supplemental responses October 15, 1991, October 23, 1991, and January 7, 1992. The Brainards filed responses September 26, 1991, and January 10, 1992. Because this court concurs in the result but differs in its interpretation of the law, the magistrate judge's report is rejected.

## FACTS

Each of the plaintiffs established one or more securities accounts at Prudential through which they purchased various limited partnerships, stock and options recommended by Sullivan, an account executive at Prudential. Sullivan operated out of Prudential's Bingham Farms, Michigan branch office where Chewning was the branch office manager.

Plaintiffs were introduced to Sullivan by Edward Arioli. Sandra Arioli became acquainted with Sullivan when Sullivan was working at Dean Witter Reynolds Securities, Inc. ["Dean Witter"]. At that time, Edward Arioli owned a controlling interest in a small, closely-held medical supply business called Mid–States Medical Supply Company ["Mid–States"]. Mid–States' minority shareholders included Dean Huber. Robert Wolfe and John Laga were Mid–States employees. With Edward Arioli as their leader, Dean Huber and John Laga built a successful business, which Edward Arioli caused to be sold to a publicly-held company called Foster Medical for stock and cash. Each of the shareholders of Mid–States and certain key employees received employment contracts with Foster Medical and lump-sum, cash distributions as well as Foster Medical stock. They continued to work for Foster Medical after the buyout under the purchase agreement.

Lawrence Brainard also owned a business which he had sold to Foster Medical. Brainard was employed by Foster Medical as part of his buyout. Edward Arioli and John Laga, in the course of their employment with Foster Medical, met Lawrence Brainard and recommended Sullivan to him.

Sullivan was introduced to each of the plaintiffs as a vice-president of Prudential, having an expertise in financial planning and tax shelters. Plaintiffs have similar backgrounds and financial situations, *i.e.*, virtually no prior investment experience in stocks, bonds, tax shelters, limited partnerships, or stock or commodity options or commodity futures. Each of the plaintiffs had come into a substantial sum of money, and each needed investment advice and counsel. Plaintiffs allege that Sullivan took advantage of their lack of sophistication or their travel schedules or the stress of business and also allege that Prudential's checks and balances either did not exist or were willfully ignored, both by Sullivan and Chewning.

Plaintiffs filed their second amended complaint November 18, 1989, which alleges

1. claims under the general Anti–Fraud provisions of the Securities Act of 1933 [the "the 1933 Act"], sections 12(2) and 15, 15 U.S.C. §§ 77*l*(2) & 77*o*;

2. claims under the general Anti–Fraud provisions of the Securities and Exchange Act of 1934 [the "1934 Act"], section 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5;

3. claims under the Michigan Uniform Securities Act, Mich.Comp.Laws Ann. § 451.10(a) [451.810(a)];

4. claims under the Michigan Consumer Protection Act, Mich.Comp.Laws Ann. §§ 455.901–.922 [445.901–.922];

5. claims under the Securities Act of Washington, Wash.Rev.Code § 21.20.005;

6. claims under the Washington Consumer Protection Act, Wash.Rev.Code § 19.86.010;

7. claims under the Racketeer Influenced and Corrupt Organization[s] Act ["RICO"], 18 U.S.C. §§ 1961–68; and

8. claims under the common law for
 a. fraud and misrepresentation,
 b. breach of contract,
 c. negligence, and
 d. breach of fiduciary duty.

## STANDARDS OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citation omitted). The Court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg*, 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted); *see also Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed. R.Civ.P. 50(a). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission of issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F.Supp. 214, 217 (E.D.Mich.1990), *aff'd*, 929 F.2d 701 (6th Cir.1991). The evidence itself need not be the sort admissable at trial. *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than the nonmovant's own pleadings and affidavits. *Id.*

Upon a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) or 12(c), all allegations in the complaint are to be accepted as true and construed in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *United States v. Mississippi*, 380 U.S. 128, 143, 85 S.Ct. 808, 816, 13 L.Ed.2d 717 (1965).

The court's inquiry is limited to whether the challenged pleadings set forth allegations sufficient to make out the elements of a right to relief. *Windsor v. The Tennes-*

*sean,* 719 F.2d 155, 158 (6th Cir.1983), *cert. denied,* 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984); *Great Lakes Steel v. Deggendorf,* 716 F.2d 1101, 1105 (6th Cir. 1983). The complaint should not be dismissed unless it appears without doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Lee v. Western Reserve Psychiatric Habilitation Ctr.,* 747 F.2d 1062, 1065 (6th Cir.1984).

## ANALYSIS

There are a number of issues contained in defendants' motions for partial summary judgment and the Brainards' motion for partial summary judgment. The only issues concerning the court in this opinion and order are (1) whether plaintiffs' claims under the federal securities laws are barred by a statute of limitations; (2) whether plaintiffs' claims under the Michigan Blue Sky Laws are barred by a statute of limitations; (3) whether plaintiffs' claims of unsuitable, unauthorized or fraudulent trading are barred by the doctrines of estoppel, waiver or ratification; (4) whether plaintiffs may rely upon defendants' oral misrepresentations; (5) whether plaintiffs' claim of unauthorized trading sets forth fraud claims under sections 10(b), 12(2) and rule 10b–5; (6) whether the Brainards have properly pleaded certain issues contained in their motion for partial summary judgment; and (7) whether Sullivan had any authority to engage in options trading in the Brainards' names.

## I

The first question presented is whether plaintiffs' claims under the federal securi-

ties laws are barred by a statute of limitations. The federal securities laws which plaintiffs allege were violated are sections 12(2) and 15 of the 1933 Act and sections 10(b) and 20 and Rule 10(b)–5 of the 1934 Act. Defendants contend that these claims are time-barred.

### A

■ Defendants rely first on section 13 of the 1933 Act to substantiate their contention that plaintiffs' claims under sections 12(2) and 15 are time barred. Section 13 states in relevant part:

> No action shall be maintained to enforce any liability created under section ... 771(2) of this title [section 12(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.... In no event shall any such action be brought to enforce a liability created under ... section 771(2) of this title [section 12(2)] more that three years after the sale.

15 U.S.C. § 77m. Because of the relationship between sections 12(2) and 15, the limitations provision of section 13 also applies to claims under section 15. *See Herm v. Stafford,* 663 F.2d 669, 679 (6th Cir. 1981). Therefore, plaintiffs' claims under sections 12(2) and 15 of the 1933 Act are barred if filed more than one year from discovery or three years from the sale.[5]

■ Plaintiffs filed their complaint January 30, 1987, in most respects more than one year after the alleged fraudulent acts, but less than three years after most of the sales.[6] Therefore, the issue becomes when

---

**5.** Plaintiffs assert that the doctrine of equitable tolling applies to their section 12(2) and section 15 claims. *See Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1875). The doctrine of equitable tolling "is read into every federal statute of limitations." *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). "However, the three-year limitation within section 13 has been held by its terms to be an absolute bar, even against ... the 'equitable tolling' of the limitations period...." *Gilbert Family Partnership v. Nido Corp.,* 679 F.Supp. 679, 683 (E.D.Mich.1988); *see also Cook*

*v. Deltona Corp.,* 753 F.2d 1552, 1562 (11th Cir. 1985); *Bull v. American Bank & Trust Co. of Pa.,* 641 F.Supp. 62, 65 (E.D.Pa.1986); *Benoay v. Decker,* 517 F.Supp. 490, 496 (E.D.Mich.1981). Therefore, this court concludes that the doctrine of equitable tolling does not apply to claims under sections 12(2) and 15 of the 1933 Act.

**6.** There appear to be some sales that occurred more than three years prior to the date the suit was filed. These sales, made to the Ariolis, appear to include

plaintiffs should have, with reasonable diligence, discovered the fraud. However, this "reasonable diligence" standard does not apply to cases of active fraudulent concealment where defendants have engaged in affirmative acts of concealment beyond the original fraud itself. *See Campbell v. Upjohn Co.*, 676 F.2d 1122, 1127 (6th Cir. 1982). Each plaintiff has set forth a claim of fraudulent concealment.

■ The Ariolis pinpoint February 1986 as the time they believed that circumstances might be objectionable. Defendants argue that a number of factors should have put the Ariolis on notice of the alleged fraud. Defendants state that retaining financial planner James Ferguson in July 1985; receiving information from Ferguson in August 1985 that options trading was high risk; and receiving Ferguson's December 12, 1985 letter warning of options trading gave or should have given the Ariolis notice. Instead, the Ariolis argue that they continued to believe in defendant Sullivan's optimistic views as opposed to the cautions expressed by Ferguson.

Defendants contend that the Ariolis have not shown acts of fraudulent concealment which would toll the statute of limitations. Silence brought about by the inability to reach defendant Sullivan and by plaintiffs' disparagement of Mr. Ferguson do not, according to defendants, constitute acts of fraudulent concealment.

The Brainards contend that it was not until late January 1986 that they were informed of the risks of option trading.[7] Defendants claim that the Brainards knew of the alleged unauthorized transactions and misrepresentations at least by December 1985 because the Brainards regularly reviewed confirmations and account statements that Prudential sent. According to this scenario, the Brainards knew or should have known within a month of the alleged

transaction that defendant Sullivan had acted in an unauthorized manner.

These disparate views reflect genuine issues of material fact regarding whether and when plaintiffs should have discovered the essential facts. *See Cohen v. Prudential–Bache Secs.*, 713 F.Supp. 653, 663 (S.D.N.Y.1989). These questions are better decided by a jury. Therefore, defendants' motions for partial summary judgment shall be denied on their assertions that plaintiffs' claims under sections 12(2) and 15 of the 1933 Act are time barred.

## B

■ Defendants also argue that the section 13 limitations provision should also apply to section 10(b), section 20 and Rule 10b–5 claims. Plaintiffs contend that Michigan six-year common law fraud limitations period is the applicable provision.

Section 10(b) of the Securities Exchange Act of 1934 has no specific statute of limitations. However, in December 1991, the Act was amended and section 27A was added. This section states, in pertinent part:

> The limitation period for any private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction. . . .

Federal Deposit Insurance Corporation Improvement Act, Pub.L. No. 102–242, 105 Stat. 2236, 2387 (1991) (amending the 1934 Act) (to be codified and inserted after 15 U.S.C. § 78aa). In *IDS Progressive Fund, Inc. v. First of Mich. Corp.*, 533 F.2d 340, 344 (6th Cir.1976), the Sixth Circuit held that in an action alleging violations of section 10(b) of the Securities Exchange Act and Rule 10b–5, Michigan's six year statute

---

Harbor Vista Assoc., Ltd. Partnership (10/12/82)
Public Storage Partners Ltd. (12/29/82)
Damson Oil Corp. Bonds (4/27/83)
 (Sandra Arioli—20,000 shares)
Balcor Equity Properties XII (pre–1984)
All Commodities trading

This court concludes that all sales made prior to January 30, 1984, may not be the subject of a federal securities law claim pursuant to sections 12(2) and 15.

7. The Brainards indicate that it was in January 1986 that they received the booklet entitled "Characteristics and Risks of Standardized Options."

of limitations for common law fraud, Mich. Comp.Laws Ann. § 600.5813, governs. *See also Campbell,* 676 F.2d at 1126 n. 4; *Herm,* 663 F.2d at 678 n. 10; *Estate of Ware v. Booras,* 788 F.Supp. 331, 333–34 (E.D.Mich.1992).

This court must follow Sixth Circuit precedent and conclude that the section 10(b) and Rule 10b–5 limitations period shall be borrowed from Michigan's common law fraud six-year statute of limitations. Because of the relationship between sections 10(b) and 20, the limitations period applicable to section 10(b) shall also apply to section 20. *See Herm,* 663 F.2d at 679. The six-year statute of limitations also applies to section 20. Therefore, defendants' motions for partial summary judgment shall be denied on their assertions that plaintiffs' claims under sections 10(b) and 20, and Rule 10b–5 of the 1934 Act are time barred.

## II

■ Defendants also contend that plaintiffs' claims under the Michigan Blue Sky Laws regarding Harbor Vista and Public Storage are also time barred. Defendants point out the relevant statute is Mich. Comp.Laws Ann. § 451.810(e), which reads in pertinent part:

> ... A person may not bring an action under subsection (a)(2) more than 2 years after such person, in the exercise of reasonable care, knew or should have known of the untruth or omission, but in no event more than 4 years after the contract of sale....

In essence, defendants claim that section 451.810(e) provides plaintiffs no more than four years from the sale of securities to commence suit. It appears that the same analysis that applied to sections 12(2) and 15 of the 1933 Act applies here as well.[8] There remains a genuine issue of material fact as to whether and when plaintiffs should have known of the untruth or omis-

sion. This question is more appropriately saved for the jury.

## III

Defendants contend that plaintiffs' claims of unsuitable, unauthorized or fraudulent trading are barred by the doctrines of estoppel, waiver and/or ratification. Each of these doctrines will be discussed separately.

### A

■ Plaintiffs assert that although the issue of estoppel is included in the captions to defendants' motions, defendants never argued estoppel in their briefs. Because defendants do not assert that plaintiffs are estopped from bringing their claims, plaintiffs suggest this argument should be deemed withdrawn. Plaintiffs also argue on the merits that where special facts exist, the receipt of transaction statements does not estop the customer from bringing suit. Plaintiffs cite *Kravitz v. Pressman, Frohlich & Frost, Inc.,* 447 F.Supp. 203 (D.Mass.1978), in support of this argument. The *Kravitz* court has declared that there can be no estoppel "if the consent is induced by undue influence over the customer, or results from the customer's trust and confidence in the broker." *Id.* at 211.

The four-part test for estoppel was spelled out in the seminal case of *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202 (9th Cir.1970), which first injected the doctrine into securities law. There the court stated that

> [f]our elements must be present to establish the defense of estoppel: (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he

---

8. There appear to be some sales that occurred more than four years prior to the date the suit was filed. These sales, made to the Ariolis, appear to include

| | |
|---|---|
| Harbor Vista Assoc., Ltd. Partnership | (10/12/82) |
| Public Storage Partners Ltd. | (12/29/82) |

This court concludes that all sales made prior to January 30, 1983, may not be the subject of a Michigan securities law claim.

must rely on the former's conduct to his injury.

*Hecht,* 430 F.2d at 1208 (quoting *Hampton v. Paramount Pictures Corp.,* 279 F.2d 100, 104 (9th Cir.1960)) (citations omitted); *see also Goldman v. Bank of Commonwealth,* 467 F.2d 439, 446 (6th Cir.1972) (holding defense of estoppel applicable to federal securities law). The following issues are all at least genuine issues of material fact for a jury: whether the plaintiffs' consent was induced by undue influence over them or resulted from their trust and confidence in the defendants, whether plaintiffs knew of the alleged omissions and misrepresentations, whether plaintiffs intentionally acted in such ways that defendants relied upon their conduct, whether defendants did not know that plaintiffs were ignorant of the true facts, and whether defendants relied to their detriment.

### B

■ In addition, defendants contend that plaintiffs' claims have also been effectively waived by plaintiffs' actions. Specifically, defendants contend that plaintiffs received confirmations and account statements which disclosed each transaction. Because plaintiffs made no complaints upon receipt of these documents, plaintiffs should be deemed to have ratified all trades and to have waived any right to claim now that the trades were not authorized.

Plaintiffs disagree. Specifically, the Ariolis maintain that they objected when they discovered that Sullivan had subscribed them in two limited partnerships they did not want or need (Polaris and Equitec Venture Leasing). Moreover, both of these investments allegedly involved fraudulent dealings by Sullivan. When the Ariolis learned of the fraud after Sullivan's firing from Prudential in February 1986, they wrote letters complaining of these matters.

The Brainards state that they complained each time they received information indicating an options trade had occurred. Upon discovery of fraud, Mr. Brainard demanded recision in written correspondence from his attorney in March 1986. He also demand-

ed cancellation and a refund for his other trades.

The following definition of waiver was provided in *Royal Air Properties, Inc. v. Smith,* 333 F.2d 568, 571 (9th Cir.1964):

> It has been held by this court that waiver is "the voluntary or intentional relinquishment of a known right. It emphasizes the mental attitude of the actor." Since waiver is a voluntary act, there must be knowledge of the right in question before the act of relinquishment can occur.

(footnote and citation omitted); *see also Goldman,* 467 F.2d at 446 (holding defense of waiver applicable to federal securities law); *Hecht,* 430 F.2d at 1208. Plaintiffs note the general rule that "[w]aiver of rights under Section 10(b) is indeed not favored, since it may be inconsistent with the deterrent aspect of the securities laws." *Neuman v. Pike,* 456 F.Supp. 1192, 1207 (S.D.N.Y.1978); *see also Childs v. RIC Group, Inc.,* 331 F.Supp. 1078, 1083 (N.D.Ga.1970).

Defendants cite *Ocrant v. Dean Witter & Co.,* 502 F.2d 854, 858 (10th Cir.1974), for the proposition that an unsophisticated investor's acknowledged receipt of confirmation slips and monthly account statements acted as a waiver of the investor's right to bring a securities fraud claim against the broker. However, in *Ocrant* the plaintiff, Nancy Ocrant, had placed these confirmation slips and statements into the hands of her husband. Mr. Ocrant thus acted as Ms. Ocrant's agent, and Ms. Ocrant's lack of knowledge was not excused. As the *Ocrant* court stated

> We are reluctant, whether under the name of estoppel, ratification, or waiver, to prevent a customer, by his mere silence, from holding his broker-agent actionable for unauthorized transactions. Nevertheless, we feel that the peculiarities of the transactions, when considered in light of the unusual facts of this case, necessitate the application of such a doctrine here.

*Id.* at 858–59; *cf. Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 906 F.2d 1206, 1213 (8th Cir.1990) (unsophisticated

investor did not waive rights by receiving and not responding to documentation); *Mihara v. Dean Witter & Co.*, 619 F.2d 814, 822 (9th Cir.1980) (same). This court agrees and finds that it is at least a question of fact whether plaintiffs waived their rights to their claims.

### C

 The defense of ratification has been applied to the federal securities laws. *See Davis,* 906 F.2d at 1213; *Mihara,* 619 F.2d at 822; *Dasler v. E.F. Hutton & Co.,* 694 F.Supp. 624, 633 (D.Minn.1988). Defendants contend that plaintiffs effectively ratified defendants' actions. "An effective ratification requires that a party be put on notice as to the true state of affairs." *Nye v. Blyth Eastman Dillon & Co.,* 588 F.2d 1189, 1197 (8th Cir.1978). Plaintiffs contend that they did not know the true state of affairs regarding their investments at Prudential until after defendant Sullivan left in February 1986. Again, because the alleged misrepresentations and omissions involve questions of material fact, this matter is better left for a jury.

### IV

 Plaintiffs next argue that they should be able to rely upon defendants' alleged oral misrepresentations. Plaintiffs contend that defendant Sullivan's *modus operandi* would help them prove their reliance upon oral misrepresentations even where writings such as subscription agreements set forth the risks associated with the investments. Plaintiffs assert that:

a. Defendant Sullivan pressured plaintiffs to purchase investments quickly;

b. Plaintiffs would sign documents without reading them because they trusted Sullivan while Sullivan was aware they had not read the documents;

c. Plaintiffs' signatures were forged;[9]

d. Plaintiffs signed documents "in blank;"

e. Documents relied upon by defendants were notarized without witnessing the signatures;

f. Plaintiffs did not receive some documents until after the investments had been made; and

g. Plaintiffs directed Sullivan to invest in conservative, safe investments.

The presumption that a written document takes precedence over an oral statement usually turns upon the sophistication of the investor and the alleged *animus* of the defendants. In *Feinman v. Schulman Berlin & Davis,* 677 F.Supp. 168, 172 (S.D.N.Y.1988), the court found that the defendants had no connection with the underlying limited partnership, thus removing any inference of scienter from the claim. Moreover, the plaintiffs did not allege that the defendants prepared the offering memorandum. *Id.* Further, the plaintiffs did not allege that the defendants had access to information which they failed to disclose. *Id.* at 172–73.

In *Platsis v. E.F. Hutton & Co.,* 642 F.Supp. 1277 (W.D.Mich.1986), *aff'd,* 829 F.2d 13 (6th Cir.1987), *cert. denied,* 485 U.S. 962, 108 S.Ct. 1227, 99 L.Ed.2d 427 (1988), the plaintiff was a graduate of the University of Michigan Law School. Prior to entering law school, the plaintiff had attended medical school for three years and finished in the top third of his class. After noting the plaintiff's education, background, and level of sophistication, the court held that:

> where an investor is presented with oral representations ... which conflict with written representations ... it is not reasonable for an investor to rely upon such oral representation[s] and as a matter of law the element of justifiable reliance is not satisfied.

*Id.* at 1299 (citing *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1518 (10th Cir.1983)); *see also Platsis v. E.F. Hutton & Co.,* 946 F.2d 38, 41 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1669, 118 L.Ed.2d 389 (1992).

---

**9.** Defendants argue that plaintiffs' forgery issue is a red herring in this case. Plaintiffs do not challenge the authenticity of their signatures on the Subscription Agreements, Option Agreements, Commodity Advisory Agreement and Risk Disclosure Statements.

Plaintiffs insist that the presumption does not apply to them because they are allegedly unsophisticated investors who completely trusted their broker. However, lack of expertise by itself is not enough.

Justifiable reliance is a question of the reasonableness of the investor's behavior in accepting the truth of defendants' assertions. Thus it is to be evaluated in light of all the elements of the transaction. Whether reliance on alleged oral misrepresentations is justified, or whether plaintiffs' reliance constitutes conduct for which they must take responsibility and which bars recovery, depends upon a balancing of numerous factors, none of which is determinative. Courts often examine the following characteristics of an investment transaction:

1. the plaintiff's sophistication in financial and securities matters;

2. the duration of personal or business relationships involved;

3. the availability of relevant information;

4. the presence of fiduciary relationships;

5. the concealment of, and the opportunity to discover, fraud;

6. which party initiated, or wished to expedite, the transaction; and,

7. the specificity of the misrepresentations.

*In re Rexplore, Inc. Secs. Litig.*, 671 F.Supp. 679, 684 (N.D.Cal.1987) (citing *Kennedy v. Josephthal & Co.*, 814 F.2d 798 (1st Cir.1987)). These characteristics involve questions of material fact best left for a jury. *See Rexplore*, 671 F.Supp. at 685.

Plaintiffs also claim that the presumption that a written document takes precedence over an oral statement is inapplicable to them because they allegedly did not have the benefit of the information contained in the documents due to defendants' fraudulent conduct. Defendants respond by citing *Zobrist* to support their contention that

plaintiffs' fraud claims are foreclosed by the full and adequate disclosure contained in the written documentation they reviewed and signed. In *Zobrist*, the plaintiff was a sophisticated businessman with prior investment experience. The plaintiff failed to read the prospectus. The jury in *Zobrist* found that defendants made "no risk" representations, that plaintiff relied on those misrepresentations, and that the reliance was justifiable. However, the *Zobrist* court reversed this finding.

In short, there is simply no evidence which provides a valid reason for Rasmussen's reliance on the general misrepresentations as to risk when he is considered to have knowledge of the specific warnings contained in the memorandum. We do not say that such reliance might not be justified under different factual circumstances. We simply conclude that, *in this case*, when knowledge of the disclosed risks is imputed to Phil Rasmussen, it is evident that he acted recklessly by intentionally closing his eyes to and failing to investigate the contradiction between the misrepresentations as the information in the memorandum. As a matter of law, Phil Rasmussen could not rely on the misrepresentations without further inquiry.

*Zobrist*, 708 F.2d at 1518–19 (emphasis added).

The *Zobrist* court pointed out more than once that "under the circumstances of this case" it would impute knowledge to the investor. Indeed, the dissent cautioned, "[T]he federal policy of deterring intentional misconduct in securities dealings outweighs the policy of deterring negligent behavior by investors." *Id.* at 1522 (Holloway, J., concurring and dissenting) (quoting *Dupuy v. Dupuy*, 551 F.2d 1005, 1019 (5th Cir.1977), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977)). There are genuine issues of material fact which preclude granting summary judgment on this matter.[10]

---

10. The Ariolis have agreed to dismiss their claims under the Michigan Consumer Protection Act. *See* Arioli resp. at 27. This agreement provides that the dismissal will not operate as an estoppel or *res judicata*, or be deemed to be dispositive of any factual or legal issues with respect to the balance of the claims. The Brainards' claims under the Michigan Consumer

## V

■ The next issue concerns whether plaintiffs' claims of unauthorized trading and unsuitable investments set forth fraud claims under sections 10(b), 12(2), or rule 10b–5.[11]

Section 10(b) provides

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Section 12(2), concerning civil liabilities arising in connection with prospectuses and communications, provides that:

> Any person who—offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him....

15 U.S.C. § 77l(2). The elements of a Rule 10b–5 cause of action are as follows:

> (1) a material and false representation or omission by defendant, (2) some form of scienter or scienter-like conduct by defendant, (3) an intention that the misrepresentation by acted upon, (4) some degree of reliance by plaintiff, and (5) actual resulting damage to plaintiff.

*Wassel v. A.G. Edwards & Sons*, 425 F.Supp. 1205, 1207 (D.Md.1977) (citation omitted).

Defendants correctly point out that in order to maintain a claim for fraud under section 10(b) and joint and several liability under section 20, plaintiffs must prove a misrepresentation or omission of a material fact, or some manipulative or deceptive conduct. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976).

Defendants cite the definition of "manipulative" in *Ernst & Ernst* in seeking to defeat plaintiffs' claims under section 10(b). Manipulation "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Id.* at 199, 96 S.Ct. at 1383. Defendants reason that plaintiffs' claims of unauthorized trading or unsuitable investments do not rise to the level of manipulative or deceptive conduct necessary for a section 10(b) claim. The conduct alleged would not artificially affect the market as a whole, but merely plaintiffs' accounts.

Plaintiffs contend that they are not alleging manipulative activity in the technical sense where it would affect the securities market in total. Rather, their claims point to either deceptive actions, material misrepresentation or nondisclosure.

> Manipulation is "virtually a term of art when used in connection with the securities markets," and refers narrowly to practices, such as wash sales, matched sales, or rigged prices, which artificially affect market activity in order to mislead investors. However, in situations not involving a manipulative scheme, the conduct alleged as fraudulent must include

Protection Act were dismissed by order of this court. *See Arioli v. Prudential–Bache Secs., Inc.*, No. 87–70312 (E.D.Mich. Apr. 30, 1992).

The analysis in this section of the opinion equally applies to plaintiffs' common law fraud and negligent misrepresentation claims. On this basis, summary judgment is not appropriate as to these claims.

11. Because these parts of defendants' motions put forth arguments that plaintiffs have failed to properly plead their claims, this court will treat these portions as motions to dismiss under Fed. R.Civ.P. 12(b)(6) and 12(c).

deception, misrepresentation, or nondisclosure to violate § 10(b) or Rule 10b–5. *Pross v. Baird, Patrick & Co.*, 585 F.Supp. 1456, 1459 (S.D.N.Y.1984) (citation omitted). Plaintiffs maintain they have met this standard in their second amended complaint because they have alleged conduct by defendants that was fraudulent, deceptive and involved misrepresentations and nondisclosures.

■ Unauthorized trades, without more, do not constitute a Rule 10b–5 violation. *Bischoff v. G.K. Scott & Co.*, 687 F.Supp. 746, 750 (E.D.N.Y.1986). In order to state a claim, plaintiff must adequately plead that any such trades constitute a deceptive practice within the meaning of section 10(b) and Rule 10b–5. *Id.* at 751. Several cases have indicated that a claim for unauthorized trading may be made under the federal securities laws. In *Village of Arlington Heights v. Poder*, 712 F.Supp. 680 (N.D.Ill.1989), the court explained that

> Drexel [the brokerage house] failed to inform them [plaintiffs] that Poder [the broker] was making unauthorized transactions…. "[T]he relevant omission alleged is the failure to inform the investor that defendant was making purchases and sales. *No omission could be more material than that.*"

*Id.* at 683 (quoting *Hometown Sav. & Loan Ass'n v. Moseley Secs. Corp.*, 703 F.Supp. 723, 724 (N.D.Ill.1988)) (emphasis in *Poder*). The *Poder* court ultimately found that the plaintiffs had sufficiently pleaded a federal claim. *Id.; see also Cruse v. Equitable Secs. of N.Y., Inc.*, 678 F.Supp. 1023, 1028–29 (S.D.N.Y.1987); *cf. Davis*, 906 F.2d at 1213–14 (accepting without comment a claim for unauthorized trading under section 10(b) and rule 10b–5); *Messer v. E.F. Hutton & Co.*, 833 F.2d 909, 916 (11th Cir.1987) (dismissing claim of unauthorized trading under section 10(b) and rule 10b–5 for failure to allege requisite scienter); *Brophy v. Redivo*, 725 F.2d 1218, 1220–21 (9th Cir.1984) (same). This court concludes that the allegations put forward in plaintiffs' second amended complaint are sufficient to make a claim under the federal securities laws. Dismissal is consequently inappropriate as to this claim.

There are also claims under section 10(b) and Rule 10b–5 for unsuitable investments.

> The law in this circuit [the Second Circuit] recognizes a claim under Section 10(b) and Rule 10b–5 "where the plaintiff alleges that a broker knowingly or intentionally chose unsuitable investments for the client." Plaintiff's vaguely worded pleadings imply such a claim. But it is not enough merely to allege or imply that the defendant broker's purchases are inconsistent with a customer's investment objective. A plaintiff must indicate which transactions and securities are involved and the reason why these securities are unsuitable.

*Bischoff*, 687 F.Supp. at 752 (citations omitted); *see also Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 493 (6th Cir.1990) (quoting *Bischoff*). Plaintiffs have done more than state "naked, conclusory allegations" concerning unsuitability. *Bischoff*, 687 F.Supp. at 753. Once again, this court finds that plaintiffs have sufficiently pleaded a claim for unsuitable investments under the federal securities laws. On this basis, this claim should not be dismissed.

## VI

The next issue raised is whether the Brainards have properly pleaded certain issues contained in their motion for partial summary judgment.[12] The Brainards contend that defendants are liable for all losses on all trades where the defendant-account executive Mr. Sullivan was unlicensed to engage in the trading of securities in the State of Washington. This allegation is absent from plaintiffs' second amended complaint dated November 18, 1988. Instead, the allegation is raised in the Brainards' motion for partial summary judgment dated December 29, 1988. While plaintiffs have brought motions to amend

---

**12.** The Brainards have failed to object to this portion of the magistrate judge's report and recommendation. This court therefore deems the Brainards to have acquiesced in the decision, and this court accepts the magistrate judge's recommendation as to this portion of his report and adds the following language solely as an explanation.

the RICO counts in their second amended complaint,[13] the Brainards have failed to bring a motion to amend the complaint to include claims of Sullivan's registration pursuant to Wash.Rev.Code § 21.20.040. Because the second amended complaint does not contain a claim against Sullivan for lack of registration, this claim is precluded as insufficiently pleaded.

## VII

■ The last issue before this court is whether Sullivan had any authority to engage in options trading in the Brainards' names.[14] The Brainards maintain that defendants are liable for all options trade losses where Sullivan was without authority to engage in any options trading.

The Brainards assert that defendant Sullivan pressured them into signing a blank Options Agreement Form which authorized some options trading. Additionally, the Brainards allege that the blank Option Agreement Form was altered to allow Level 2 options trades and to reflect that their investment goal was "speculation." Further, the Brainards have provided a third Option Client Information Form and Agreement, unsigned by them, but which authorizes Level 3 options trading, the riskiest of trades.

Sullivan testified at his deposition that he could not recall asking the Brainards to sign in blank. Defendants note that Sullivan has testified that he had verbal authority from the Brainards to engage at these levels of trading. This creates a genuine issue of material fact better left for a factfinder.

Defendants further argue that even if Prudential's in-house rules required them to have a signed, written authorization for Level 3 trading, the Brainards would have no private right of action for violation of a broker's in-house rules. Defendants cite *J.E. Hoetger & Co. v. Ascencio*, 572 F.Supp. 814 (E.D.Mich.1983), for this propo-

sition. However, the facts are distinguishable from those in the instant case. In *Hoetger, plaintiff* exceeded his trading limit, set at $4,000.00; and his limit was increased to accommodate his trading. Notably, his claim differs from the Brainards' claims because the *Hoetger* plaintiff

> contends that Merrill Lynch should not have allowed him to trade in the commodities futures market in that his temperament was not suited to it; should not have allowed him to exceed his established trading limits; and should not have extended his trading limits upward to accommodate his wishes. By admission the argument is a paternalistic one: that defendant should have protected Hoetger from his own greed.

*Id.* at 821. In the present case, it is the stockbroker's greed that is at issue rather than that of the client. The dispute in this case is not whether defendant Sullivan neglected to get written authority but whether he had any authority, verbal or written, at all. This issue is also not suitable for resolution through a summary judgment motion.

## ORDER

Therefore, it is hereby ORDERED that defendants' motions for partial summary judgment are GRANTED in part and DENIED in part.

It is further ORDERED that plaintiffs Brainards' motion for partial summary judgment is DENIED in part.

SO ORDERED.

---

**13.** These motions were granted by this court's April 30, 1992 opinion and order.

**14.** The Brainards have also failed to object to this portion of the magistrate judge's report and recommendation. This court therefore deems the Brainards to have acquiesced in the decision, and this court accepts the magistrate judge's recommendation as to this portion of his report and adds the foregoing language solely as an explanation.