16 F.3d 1226
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
 Lee G. WEINBERG, Plaintiff-Appellee,
v.
David A. BLUMENFELD, Edgar Blumenfeld and Residential Care
Facility of Miller Beach, Incorporated, an
Illinois corporation, Defendant-Appellants.
 No. 93-1049.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 6, 1994.
Decided Jan. 25, 1994.
 
 Before CUDAHY, COFFEY and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Defendants appeal from a judgment finding them liable to their limited partner, Lee Weinberg, under Section 12(2) of the Securities Act of 1933 and Section 137.12 of the Illinois Securities Law of 1953. For the reasons stated in the attached well-reasoned district court opinion of November 4, 1992, as amended,[1] we AFFIRM.
 
 ATTACHMENT
 IN THE UNITED STATES DISTRICT COURT
 FOR THE NORTHERN DISTRICT OF ILLINOIS
 EASTERN DIVISION
 
 2
 Lee G. Weinberg,
 
 
 3
 Plaintiff,
 
 
 4
 v.
 
 
 5
 David A. Blumenfeld, Edgar Blumenfeld, and Residential Care
 
 
 6
 Facility of Miller Beach, Inc., an Illinois corporation,
 
 
 7
 Defendants.
 
 FINDINGS OF FACT AND CONCLUSIONS OF LAW
 FINDINGS OF FACT
 
 8
 1. Plaintiff, Lee Weinberg ("Weinberg"), filed this suit on August 2, 1990. The case went to trial on plaintiff's amended complaint alleging violations of Section 12(2) of the Securities Act of 1933 (the "1933 Act") (Count 1), Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 (Count 2), Section 137.12 of the Illinois Security Laws of 1953 (Count 3), common law fraud (Count 4), and breach of fiduciary duty (Count 5). The first four Counts are based on the sale of a limited partnership interest in a residential care facility to plaintiff by the general partner. Count 5 is based on the alleged failure to keep plaintiff informed about unfavorable expense and operating deficit projections and other negative developments.
 
 
 9
 2. Weinberg is the sole limited partner of the Miller Beach Limited Partnership ("partnership"). Defendant, Residential Care Facility of Miller Beach, Inc. ("Miller Beach"), is the general partner. Defendants, David Blumenfeld ("David") and Edgar Blumenfeld ("Edgar"), or (the "Blumenfelds"), are brothers and were the shareholders of the corporate general partner at the time of the formation of the partnership on February 8, 1988. At that time, Edgar was the president of the general partner.
 
 
 10
 3. The object of the partnership was to purchase and rehabilitate a motel in Gary, Indiana, and operate it as a residential care facility for indigent older adults who, while needing assistance in daily living, do not need the level of skilled nursing services provided by a nursing home.
 
 
 11
 4. David and Edgar are both attorneys and were interested in investing together in a nursing home or residential care facility. The proposed Miller Beach project first came to the attention of Edgar as a result of a conversation with Robert O'Brien ("O'Brien"), an attorney and officer of Centennial Mortgage ("Centennial"), a company specializing in servicing loans insured by the Department of Housing and Urban Development ("HUD").
 
 
 12
 5. O'Brien told Edgar that a previous effort to convert the motel in Lake County, Indiana, into a residential care facility had been brought to Centennial for financing but had fallen through. Following an investigation by David, it was disclosed that the owner of the motel was still interested in selling.
 
 
 13
 6. As a result, Edgar and David met with O'Brien in the late spring of 1987 to discuss financing of the Miller Beach project. O'Brien told them that the project would qualify for a HUD insured loan.
 
 
 14
 7. O'Brien gave the Blumenfelds a 1986 letter from Robert Fields ("Fields") of the Lake County Welfare Board that had been addressed to the person who had previously attempted to develop Miller Beach. The letter stated in part:
 
 
 15
 We would like to confirm that you will hold all of the residential units for use by our department in referring residents. We would confirm a utilization of a least 180 residential units per month (on an annual basis) within ninety days of the opening of the facility. (Meaning we would reach that level within ninety days).
 
 
 16
 8. In the succeeding months, Edgar and David conducted an investigation of the demographics of the area to be served by the facility and the availability of competing institutions, and determined the views toward a new facility from the movers and shakers in the area. Edgar visited similar institutions in Miami, Florida, and talked to the owners about their operations. They also came into possession of a second letter written by Fields, this one addressed to the owner of the motel. This letter restated the need for such a residential care institution but omitted the alleged confirmatory language of the 1986 letter. The Blumenfelds did not rely on either letter from Fields as a guarantee of patient placements. They both knew that, due to patient rights laws, no one could guarantee any patient placement. In addition to this investigation, the Blumenfelds had previous experience in health care law and had investigated previous investment opportunities in the health care residential industry. They did not consult any specialist in senior residential care.
 
 
 17
 9. In October, 1987, the Blumenfelds again met with O'Brien, who advised them that HUD would only insure 90 percent of the funds needed for the project and David and Edgar would have to come up with $500,000 in cash to obtain loan insurance approval for the project. One-half would be used for acquisition and one-half to fund initial operating expenses and related costs.
 
 
 18
 10. In order to come up with the needed cash investment, the Blumenfelds began looking for a partner with money to invest. David's son, Loren Blumenfeld ("Loren"), approached plaintiff, a social acquaintance of his, about investing in the project.
 
 
 19
 11. Weinberg, a commodities trader at the Chicago Board of Trade, was experienced in investing in limited partnerships, had money to invest, and was interested in the Miller Beach project. After several conversations with Loren, a meeting was set up between Weinberg and David.
 
 
 20
 12. Prior to the meeting with Weinberg, David and his accountant, Louis Epstein ("Epstein"), prepared pro forma projections of income and expenses for the first five years of the project. These projections were reduced to writing and were sent to plaintiff on December 10, 1987. (Plft. ex. 1) These projections showed that the facility was expected to fill to 90 percent occupancy, or 173 residents, within ten months of start-up, with all of them arriving in the last four months of this period. The expense projection was $450,000 for the first year and $750,000 for the second year. Net income after debt service was projected to be $80,960 in the first year; $655,693 in the second year; and $660,000 in years three through five. Epstein did not have any expertise in senior residential care.
 
 
 21
 13. At their meeting in December, 1987, David gave Weinberg these projections and told him they were conservative in that vacancies and expenses were overstated and revenues were understated. He told Weinberg that he was looking for a $500,000 investment. Weinberg told David to contact his brother-in-law, Bernard Kramer ("Kramer"), an attorney with Skadden Arps specializing in corporate matters, to discuss the proposed investment.
 
 
 22
 14. On December 10, 1987, David sent a letter to Kramer, formally offering to sell Weinberg a limited partnership interest in Miller Beach, outlining terms of sale, and enclosing the pro forma projections of income and expenses. In this letter David confirmed his oral representation to Weinberg that the revenues were understated and the expenses were overstated. The projected net profit was used by David to explain how Weinberg could expect to recover his entire investment within five years, "and quite probably before that time." This letter and projections constituted a prospectus.
 
 
 23
 15. As a result of this offer, David drafted a limited partnership agreement and sent it to Kramer. After numerous discussions with Kramer, and several revisions, the partnership agreement was reduced to final form, and was executed by the parties on February 8, 1988. (Plft. ex. 2)
 
 
 24
 16. In accordance with the terms of the agreement, Weinberg, on the same date, gave David an irrevocable letter of credit in the amount of $500,000 for the benefit of the partnership. Although Weinberg claims that he was verbally assured that only one-half of the letter of credit would be drawn down, the partnership agreement contained no such limit.
 
 
 25
 17. On February 29, 1988, Edgar executed, and filed on behalf of the partnership, an application for project mortgage insurance with HUD. (Plft. ex. 3) On the application to HUD, the annual operating expenses for the project were projected to be $1,043,908, which was a sum 33 percent greater than the so-called "conservative" expense projection David had given Weinberg in December, 1987. David testified that this discrepancy was due to the different level of care to be provided the residents of the Miller Beach project. According to David, defendants intended to accept only healthy residents not in need of nursing care. If a resident became in need of nursing care, the resident would be transferred to a nursing home. HUD, on the other hand, did not look kindly on such limited care facilities so to obtain HUD insurance defendants described a higher care facility on the application.
 
 
 26
 18. On August 29, 1988, HUD issued a loan insurance commitment for the project. (Plft. ex. 5) HUD also prepared and gave to David an appraisal of the project. (Plft. ex. 6) This appraisal estimated annual operating expenses for the project to be $1,072,797. More importantly, HUD projected only 25.2 percent occupancy for the first year, 63.1 percent for the second year, and 90 percent for the third year. The lower occupancy and higher expense projections caused HUD to predict an operating deficit of $339,390 for the first year and $73,265 for the second year.
 
 
 27
 19. The HUD commitment was also conditioned on the partnership having $412,655 in funds to meet project expenses, which was in excess of the original estimate. David was forced to find someone to loan additional cash to the project. He obtained an additional letter of credit in the amount of $250,000 from David Reiner ("Reiner"), another trader at the board of trade. The partnership agreed to pay Reiner the difference between what Reiner earned on the funds securing the letter of credit and 20 percent.
 
 
 28
 20. On September 6, 1988, Edgar filed another application for project mortgage insurance asking for a slightly greater mortgage amount. (Plft. ex. 7) Again, he estimated annual operating expenses to be more than $1 million.
 
 
 29
 21. By December of 1988 the partnership had drawn down $250,000 of Weinberg's letters of credit to pay for the purchase of the property and for initial expenses. On December 15, 1988, at David's request, Weinberg executed three new letters of credit to substitute for the original one. These were to the benefit of Centennial Mortgage and were in the amounts of $162,655, $43,200, and $45,400.
 
 
 30
 22. In December 1989, Centennial drew down on one of the letters of credit. Weinberg asked David for an explanation and was told that the draw was an error and would be immediately corrected. At this time, Weinberg and Kramer demanded more information from defendants about the status of the partnership. They had not received the certified annual report as required by the partnership agreement.
 
 
 31
 23. On February 2, 1990, Edgar wrote Kramer a letter enclosing copies of all letters of credit and a cash flow statement for the first nine months of projected operations which showed a projected deficit of $251,560 instead of an $80,000 profit. (Plft. ex. 25) This was the first Weinberg knew about the letter of credit from Reiner and that the projections of income and expenses given him in December, 1987, to induce him to invest were incorrect. Plaintiff was, therefore, on notice that his investment might be subject to rescission under Illinois security law because it may have been induced through misrepresentations of material fact.
 
 
 32
 24. Each side called an expert on the finance of residential care facilities to testify on the projected fill rate and the expenses of the project. Plaintiff's expert, Dr. Grant Shumway ("Shumway"), testified that the expected fill rate for a project of this type was 4 to 6 new residents per month, and the fill rate projected by defendants in the December 10, 1987 letter was not reasonable. Defendants' expert, Arthur Cobb ("Cobb"), likewise testified that the projected fill rate contained in the December 10, 1987 letter was not reasonable. The actual fill rate experienced at Miller Beach, to date, has been approximately 3 new residents per month, a figure far short of projections. Because of transfers out due to ill health and other reasons, total occupancy has never approached the 90 percent projection and has always been less than 50 percent. Shumway explained that this was expected because residential care facilities that do not take or keep residents in need of nursing care anticipate a turnover rate approaching 50 percent.
 
 
 33
 25. The experts each opined on the reasonableness of the project expense projections contained in the December 10, 1987 letter. Shumway testified that the projections in the $1 million range contained on the HUD application and the HUD analysis were reasonable and, therefore, defendants' projections were unreasonable. Cobb, on the other hand, testified that these expense projections were "not unreasonable" for the health care level planned.
 
 
 34
 26. Neither David nor the accountant Epstein consulted with any such expert before preparing the projections in the December 10, 1987 letter to Weinberg. The fill rate and population projections were prepared by them solely on the community survey defendants had conducted.
 
 
 35
 27. Defendants attempted to explain the difference between their expense projections (ex. 1) and those made on the HUD application (ex. 5). They said that they placed higher expense projections on the HUD application because HUD wanted to see very conservative numbers and would not approve a facility operated at the low level of care intended for Miller Beach. But they knew, or should have known, that their restrictive admissions policy adopted to achieve lower expenses would have had a marked effect on the fill rate and turnover rate.[1]
 
 
 36
 28. The Blumenfelds told Weinberg that the projections given him were conservative. However, in no way could these projections have been considered conservative. Defendants had no reasonable basis upon which to ground them. They did not consult an expert. In fact, defendants' trial expert, Cobb, testified that he was only aware of a single residential facility that had a fill rate similar to that projected by defendants for Miller Beach, and that was not a comparable project. Defendants knew, or should have known, that the projections they quoted to plaintiff were wishful thinking. It is obvious that they were prepared with the purpose of making the proposed investment look irresistible to Weinberg. The court finds that defendants have failed to prove by a preponderance of the evidence that they exercised due care in the preparation of the December 10, 1987 projections. They were, in fact, negligent.
 
 
 37
 29. However, the Blumenfelds did believe that the project would be ultimately successful. They, especially David, invested thousands of hours of time and thousands of dollars in pursuing the project. While the court finds that defendants were negligent in preparing the projections for use in selling the project to Weinberg, the court does not find that defendants knew that they were false nor was their method of preparation so egregious as to render dissemination reckless.
 
 CONCLUSIONS OF LAW
 A. Count I--Section 12(2)
 
 38
 1. Section 12(2) of the 1933 Act provides a remedy to a purchaser of a security made on the basis of an untrue statement of a material fact contained in a prospectus. The remedy is to recover the consideration paid by him. The only defense to an untrue statement of a material fact is lack of knowledge and the exercise of reasonable care in making the statement. The burden of proof is on the seller. Under the 1933 Act, projections which are neither reasonable nor reasonably justified when made constitute misrepresentations of material facts. Acme Propane, Inc. v. Tenexco, 844 F.2d 1317, 1324 (7th Cir.1988); Weilgos v. Commonwealth Edison Co., 892 F.2d 509, 513 (7th Cir.1989). Defendants concede that the limited partnership interest purchased by Weinberg is a security and the letter of December 10, 1987 (plft. ex. 1) is a prospectus. Defendants argue that the evidence showed that they did exercise reasonable care in putting together the projections but the court has found that they did not do so. (FF No. 28) It is also clear from the emphasis defendants placed on the projections in attempting to demonstrate the short period of time needed to recoup the investment that the projections were very material to the sales presentation. The projections were wrong and defendants were negligent in their preparation and that is all that is needed to make the defendants liable under Section 12(2).
 
 
 39
 2. Actions under Section 12(2) must be brought within three years from the date of purchase, or one year from discovery of facts giving rise to the claim, whichever is the shorter period. Short v. Belleville Shoe, 908 F.2d 1385, 1392 (7th Cir.1990). Defendants claim that the evidence showed that Weinberg and Kramer were advised about the HUD projections in early 1988 and, thus, more than one year after discovery of the facts giving rise to the claim. The evidence was in dispute whether the HUD application was shown to either Weinberg or Kramer but defendants contend that they took great pains to assure plaintiff (and the court) that the HUD application figures were inaccurate and used only to placate HUD. Defendants cannot have it both ways. If, as David assured us, the HUD figures were wrong, rather than the December 10, 1987 figures, then Weinberg would not have been on notice that these December 10, 1987 figures were wrong. It was not until February 2, 1990 when he was advised of the revised projections that Weinberg was actually put on notice that the projections were incorrect. (FF No. 21) Thus, the law suit which was filed within a year, August 2, 1990, was timely.
 
 
 40
 3. The court finds that defendants are liable under Section 12(2) for the consideration paid for the limited partnership share, with prejudgment interest upon the tender of the partnership share.
 
 B. The Fraud Counts
 
 41
 1. Section 10(b) of the 1934 Act and Rule 10b-5 (Count 2) requires scienter. Mere negligent conduct is not sufficient. Ernst & Ernst v. Hochfelder, 96 S.Ct. 1375, 1381 (1976); Eisenberg v. Gagnon, 766 F.2d 770, 776 (3rd Cir.1985); Estate of Detwiler v. Offenbecher, 728 F.Supp. 103, 137 (S.D.N.Y.1989). A plaintiff must establish that the defendant disseminated forecasts knowing they were false or that the method of preparation was so egregious as to render their dissemination reckless. Eisenberg at 776. The same is true with common law fraud. I.L.P. Fraud, Sec. 26. Here, the evidence was short of this. (FF No. 29) There is little question that defendants were negligent but there is substantial question that they had the requisite mental state to support a finding of fraud. The question of recklessness is closer, but the court finds that plaintiff did not prove the requisite egregiousness by the preponderance of the evidence.
 
 
 42
 2. The court finds in favor of defendants on Counts 2 and 4.
 
 C. The Illinois Securities Law
 
 43
 1. The Illinois Securities Law (Count 3) is similar to Section 12(2) in that there is no scienter requirement. Ill.Rev.Stat., ch. 121 1/2, Sec. 137.12G and H; Foster v. Alex, 157 Ill.Dec. 778, 781 (5th Dist.1991).
 
 
 44
 2. However, there is a 6-month notice period after the plaintiff learns of the voidability of his security purchase. Ill.RevStat., ch. 121 1/2, Sec. 131.13B. Here, the evidence showed that Weinberg and Kramer, a securities lawyer in his own right, learned of the inaccurate projections on February 2, 1990. (FF No. 23) Weinberg gave the appropriate notice in July, which was more than six months after learning of the inaccuracies. Having failed to send the appropriate notice within 6 months dooms Weinberg's state securities law claim.
 
 
 45
 3. Count 3 is dismissed.
 
 D. Breach of Fiduciary Duty
 
 46
 1. Count V of the complaint alleges a breach of fiduciary duty which existed between defendants, the general partner, and Weinberg, the limited partner. See Nelson v. Warnke, 77 Ill.Dec. 900, 901 (1st Dist., 1984). However, most of the complaints of Weinberg, e.g., the draw down of his letter of credit and the borrowing from Reiner, were either explicitly or implicitly allowed by the partnership agreement. He was informed about the HUD projections but was told to ignore them. These failures were not the cause of his loss. His loss was occasioned by the investment itself and not the subsequent activities of the defendants who have sincerely tried to make the investment succeed, even to the extent of investing large amounts of their own money.
 
 
 47
 2. The court finds that defendants prevail on Count 5.
 
 CONCLUSION
 
 48
 1. The court enters judgment in favor of plaintiff, Weinberg, on Count 1 of the amended complaint in the amount of $500,000, the consideration paid for the security, together with prejudgment interest compounded annually.
 
 
 49
 2. The interest is to commence on the dates that Weinberg's letters of credit were drawn down and to be calculated only on the amounts actually used. The interest is to be the prime rate adjusted annually.
 
 
 50
 3. Attorney's fees are allowable under the 1933 Act in the discretion of the court in those cases where "the court believes ... the defense to have been without merit...." Section 11(e) of the 1933 Act. The court does not find that the defenses of defendants were without merit. Accordingly, the court declines to award plaintiff attorney's fees.
 
 
 51
 4. Judgment is entered in favor of defendants and against plaintiff on Count 2, 3, 4, and 5.
 
 
 52
 IT IS SO ORDERED.
 
 
 53
 --------/s/ Harry D. Leinenweber
 
 
 54
 --------HARRY D. LEINENWEBER, Judge
 
 
 55
 --------United States District Court
 
 DATED: NOV 4 1992
 
 
 [1]
 In the attached November 4, 1992, Findings of Fact and Conclusions of Law, the court awarded the plaintiff $500,000 plus interest on Count 1 and entered judgment for the defendants on Counts 2, 3, 4 and 5. In regards to Count 3, the only reason the court dismissed the Illinois Securities Law claim was due to an inadvertant miscalculation of dates. The court found that the plaintiff discovered his purchase of the security was voidable on February 2, 1990 and that he gave the defendants notice of his election to rescind the purchase in July 1990. Somehow the court mistakenly concluded that plaintiff's notice was not within the statutorily required six months. On December 9, 1992, the court corrected its error by granting the plaintiff's motion to alter or amend the judgment. The court entered judgment for the plaintiff on the Illinois Securities Law claim which included an award for reasonable attorneys' fees and costs
 
 
 [1]
 This has apparently been borne out. Due to an extremely low residential population, defendant has changed its admission policies to accept patients from mental health centers who are on medication